**Back**

U.S. DISTRICT COURT
EASTERN DISTRICT-WI
FILED

'09 NOV 10 A11 :24

JON W. SANFILIPPO
CLERK

ATTACHMENT
TO
COMPLAINT:

09 - C - 1050

11/09/2009

PoA ₩₩₩

4-27  C° col.



## DEPARTMENT OF VETERANS AFFAIRS
### Milwaukee VA Regional Office
### 5400 W. National Ave
### Milwaukee, WI 53214

**Ernest L. Moorer**

**VA File Number
29 615 583**

**Represented by:
WISCONSIN DEPARTMENT OF VETERANS AFFAIRS**

**Rating Decision
April 15, 2009**

### INTRODUCTION

The records reflect that you are a veteran of the Peacetime. You served in the Navy from November 15, 1978 to December 4, 1981. We received a request to reopen a previous claim on October 10, 2008. Based on a review of the evidence listed below, we have made the following decision(s) on your claim.

The Veterans Claims Assistance Act (VCAA) of 2000 requires that VA notify the claimant and the claimant's representative, if any, of any information and any medical or lay evidence, not previously provided to VA, that is necessary to substantiate the claim. VA must also advise a claimant which evidence the claimant must supply and which evidence VA will obtain on his or her behalf. The VCAA also requires VA to make reasonable efforts to assist a claimant in obtaining evidence necessary to substantiate a claim for a VA benefit unless no reasonable possibility exists that such assistance would aid in substantiating the claim.

When considering the circumstances of the current claim as discussed below, VA has satisfied the notification and duty to assist provisions of the law and no further actions need be undertaken by VA, pursuant to VCAA, on the claimant's behalf.

Case 2:09-cv-01050-PJG Filed 11/10/09 Page 2 of 54 Document 4

## DECISION

1 . New and material evidence has been received to reopen the claim for service connection for diabetes mellitus due to medication prescribed for psychosis, and service connection is granted with an evaluation of 20 percent effective October 10, 2008.

2 . Service connection for hypertension secondary to your diabetes mellitus type II is denied.

3 . A finding of incompetency is confirmed.

## EVIDENCE

- Claim to reopen service connection for diabetes mellitus type II received from the Wisconsin Department of Veterans Affairs (WDVA) October 10, 2008
- Correspondence from Ernest J. Blansfield, Jr., Zyprexa Special Master Attorney at Law, received October 10, 2008
- Correspondence from K. Camp Bailey, Attorney at Law, received October 10, 2008
- Zyprexa Settlement Amount statement received October 10, 2008
- Correspondence from Matthews & Associates received October 10, 2008
- VA Medical Center (VAMC) treatment records from November of 2004 to April of 2009
- VA development letter to you sent November 10, 2008
- Claim for hypertension received from the WDVA February 13, 2009
- VA development letter to you sent February 23, 2009
- Your phone call on April 1, 2009 requesting that w review recent treatment records from VAMC Milwaukee from your March 28, 2009 date of admission
- Service treatment records from November of 1978 to June of 1981
- VA Rating Decision dated January 20, 2004

## REASONS FOR DECISION

### 1. Service connection for diabetes mellitus type II due to medication prescribed for psychosis as secondary to the service-connected disability of schizophrenic disorder, paranoid type is granted.

Service connection for diabetes mellitus due to medication prescribed for psychosis has been established as related to the service-connected disability of schizophrenic disorder, paranoid type. An evaluation of 20 percent is assigned from October 10, 2008, the date we received your reopened claim.

Service connection for diabetes mellitus type II was previously considered and denied because the evidence of record did not show that your diabetes mellitus type II was due to medication prescribed for your service connected psychosis, nor is there any evidence of this disability during military service. You were informed of this decision in a letter dated January 21, 2004. As no timely appeal was received, that decision became final.

The law and regulations provide that a final and binding decision shall not be subject to revision on the same factual basis. Once a claim has been finally disallowed, it cannot be reopened unless "new" and "material" evidence is received. A claimant may reopen a finally adjudicated claim by submitting new and material evidence. New evidence means existing evidence not previously submitted to agency decision makers. Material evidence means existing evidence that, by itself or when considered with previous evidence of record, relates to an un-established fact necessary to substantiate the claim. New and material evidence can be neither cumulative nor redundant of the evidence of record at the time of the last prior final denial of the claim sought to be reopened, and must raise a reasonable possibility of substantiating the claim.

We received a claim to reopen your previously denied claim for diabetes mellitus type II on October 10, 2008. A VA development letter was sent to you on November 10, 2008. The letter informed you what we still need from you, what the evidence must show to establish entitlement, what is the status of your claim, and how you can help your claim. You were sent authorization forms to complete and return if you wished the VA to obtain private medical records on your behalf. You were specifically informed that if there is any other evidence or information that you think will support your claim, you were to let us know. If you have any other evidence in your possession that you think pertains to your claim, please submit it to us.

Along with your claim, we received correspondence from Ernest J. Blansfield, Zyprexa Special Master and Attorney at Law, dated March 28, 2007. It states that your attorneys reached an agreement with Eli Lilly and Company, manufacturers of Zyprexa, and that you were to receive a monetary award. We received correspondence from K. Camp Bailey, Attorney at Law, dated March 29, 2007, regarding your Zyprexa settlement. We received a Zyprexa Settlement Amount dated February 7, 2007, stating that you are to receive a monetary settlement from Eli Lilly, makers of Zyprexa. We also received a statement from Matthews & Associates, which shows that you first began using Zyprexa prior on September 2, 2003, and were diagnosed with diabetes mellitus type II on September 11, 2003, which enables you to receive a monetary settlement from Eli Lilly and Company. This is considered new and material evidence, and your claim has been reopened.

You also called the VA on April 1, 2009 and informed us that you were admitted for treatment to the VAMC in Milwaukee on March 28, 2009, and asked that we consider these additional records. Please be advised that we included these VAMC records when making our decision.

Review of your VAMC Milwaukee treatment records show that a diabetes mellitus exam was completed on February 6, 2009. The examiner noted that you reported no diagnosis of diabetes during the 1990s or early 2000s. You began taking Seroquel for treatment of your service connected mental illness while you were incarcerated at Red Granite, and for an unknown reason, you were switched to Zyprexa. You told the examiner that your blood sugar went extremely high, necessitating hospitalization and treatment for diabetes requiring insulin and Metformin. You continued to take all of those medications until about 2005, when you became concerned about the side effects of these medications. The examiner noted that although you no longer take the above-named medications for your mental illness, you continue to have diabetes mellitus type II. You told the examiner that your diabetes does not restrict your activities, nor do you suffer any other side effects of the diabetes. You feel that there has been a change in your vision, and you now require glasses to read. However, there is no objective evidence of any diabetic retinopathy or other eye diseases related to diabetes.

The VA examiner opined that your diabetes mellitus type II is likely the direct result of the medication you were prescribed to treat your service connected schizophrenia. He stated that there is literature to support that use of both Zyprexa and Seroquel have resulted in diabetes mellitus type II in a sufficient number of cases. Therefore, service connection is granted with an evaluation of 20 percent based on your need for medication to control the diabetes mellitus type II. A higher evaluation of 40 percent is not warranted unless insulin, restricted diet, and regulation of activities are required. Regulation of activities is described as avoidance of strenuous occupational and recreational activities as directed by a physician or medical specialist, for diabetics who have unstable blood sugars, or are prone to episodes of hypoglycemia or ketoacidosis. A higher evaluation is not warranted at this time.

If you develop any complications of diabetes, such as retinopathy or radiculopathy, please inform us.

## 2. Service connection for hypertension as secondary to your service connected diabetes mellitus type II is denied.

Service connection for hypertension secondary to your service connected diabetes mellitus type II is denied because there is no evidence that this disability has been clinically diagnosed. Also, service connection for hypertension is denied because there is no evidence of a currently diagnosed chronic condition which began during service or was caused by an event or experience during service. Additionally, there is no evidence showing that hypertension was diagnosed and manifested to a compensable degree (10 percent or greater) within a one year period following service discharge, for consideration of service connection on a presumptive basis.

On February 13, 2009, we received your claim for service connection for hypertension secondary to your service connected diabetes mellitus type II, although service

connection for diabetes had not yet been established. A VA development letter was sent to you on February 23, 2009. The letter informed you that of what we still need from you in the event service connection is granted for diabetes mellitus type II, what the evidence must show to establish entitlement, what is the status of your claim, and how you can help your claim. You were furnished with authorization forms to complete and return if you wished the VA to obtain private medical records on your behalf. You were specifically informed that if there is any other evidence or information that you think will support your claim, you were to let us know. If you have any other evidence in your possession that you think pertains to your claim, please submit it to us.

You called the VA on April 1, 2009 and informed us that you were admitted for treatment to the VAMC in Milwaukee on March 28, 2009, and asked that we consider these additional records. Please be advised that we included these VAMC records when making our decision.

As stated above, service connection for diabetes mellitus type II has been granted as secondary to your service connected schizophrenia. We therefore considered service connection for hypertension as secondary to your diabetes.

A review of your service treatment records shows no evidence of treatment for, nor complaints of, hypertension in service.

Review of your Milwaukee VA Medical Center (VAMC) treatment records from October of 2008 through April of 2009 show no diagnosis of hypertension, nor is there a history of elevated blood pressure readings. A diabetes mellitus exam was completed at the VAMC on February 6, 2009, during which your blood pressure was 128/70, including readings of 142/86 on the right arm, 138/94 on the left arm, and 148/100 on the left arm repeated. The examiner noted that you should follow up with your primary care physician for your elevated blood pressure readings, and stated that you may have hypertension. However, no diagnosis was provided. Subsequent VAMC treatment records show normal blood pressure readings and do not show a diagnosis of hypertension.

Since there is no diagnosis of hypertension, and you are not on any blood pressure medication, service connection for hypertension as secondary to your diabetes mellitus type II is denied.

### 3. Competency to handle disbursement of funds.

Since you have a service connected psychiatric disability evaluated at 100 percent, the issue of competency is being reviewed. It is noted that you have been rated as incompetent since November of 2006.

A mentally incompetent person is defined as one who, because of injury or disease, lacks the mental capacity to control or manage his or her own affairs, including disbursements of funds without limitation. Where there is doubt as to whether the beneficiary is capable of administering his or her funds, such doubt will be resolved in favor of competency.

Since there has previously been a definitive finding of incompetency by a physician in this case, and there is no current evidence to show that you are able to manage personal affairs to include disbursement of funds, we have determined that you remain incompetent for purposes of managing VA payments.

## **REFERENCES:**

Title 38 of the Code of Federal Regulations, Pensions, Bonuses and Veterans' Relief contains the regulations of the Department of Veterans Affairs which govern entitlement to all veteran benefits. For additional information regarding applicable laws and regulations, please consult your local library, or visit us at our web site, www.va.gov.

| NAME OF VETERAN<br>Ernest L. Moorer | VA FILE NUMBER<br>29 615 583 | SOCIAL SECURITY NR<br>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 | POA<br>WISCONSIN<br>DEPARTMENT OF<br>VETERANS AFFAIRS | COPY TO<br>POA |

| ACTIVE DUTY | | | |
|---|---|---|---|
| EOD | RAD | BRANCH | CHARACTER OF DISCHARGE |
| 11/15/1978 | 12/04/1981 | Navy | Under Honorable Conditions |

| LEGACY CODES | | | |
|---|---|---|---|
| ADD'L SVC CODE | COMBAT CODE | SPECIAL PROV. CDE | FUTURE EXAM DATE |
|  | 1 |  | None |

**JURISDICTION:** Reopened Claim Received 10/10/2008

**ASSOCIATED CLAIM(s):** 020; Reopened Compensation 10/10/08

**SUBJECT TO COMPENSATION (1. SC)**

9203    SCHIZOPHRENIC DISORDERS PARANOID TYPE
Service Connected, Peacetime, Incurred
100% from 11/01/1998

7913    DIABETES MELLITUS DUE TO MEDICATION PRESCRIBED FOR
PSYCHOSIS ASSOCIATED WITH SCHIZOPHRENIC DISORDER,
PARANOID TYPE
Service Connected, Peacetime, Secondary
20% from 10/10/2008

**COMBINED EVALUATION FOR COMPENSATION :**

100% from 11/01/1998

**NOT SERVICE CONNECTED/NOT SUBJECT TO COMPENSATION (8.NSC Peacetime)**

7101    HYPERTENSION ASSOCIATED WITH DIABETES MELLITUS DUE TO
MEDICATION PRESCRIBED FOR PSYCHOSIS
Not Service Connected, Not Secondary

9411    POST TRAUMATIC STRESS DISORDER [PTSD/Other/Unknown-PTSD]
Not Service Connected, Not Incurred/Caused by Service

Individual Unemployability Denied

| **Rating Decision** | **Department of Veterans Affairs** **VA REGIONAL OFFICE** | | | Page 1 01/05/2009 |
|---|---|---|---|---|
| NAME OF VETERAN Ernest L. Moorer | VA FILE NUMBER 29 615 583 | SOCIAL SECURITY NR 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 | POA WISCONSIN DEPARTMENT OF VETERANS AFFAIRS | COPY TO POA |

| **ACTIVE DUTY** | | | |
|---|---|---|---|
| **EOD** | **RAD** | **BRANCH** | **CHARACTER OF DISCHARGE** |
| 11/15/1978 | 12/04/1981 | Navy | Under Honorable Conditions |

| **LEGACY CODES** | | | |
|---|---|---|---|
| **ADD'L SVC CODE** | **COMBAT CODE** | **SPECIAL PROV CDE** | **FUTURE EXAM DATE** |
| | 1 | | None |

**JURISDICTION:** Medical or Other Evidence Received 08/22/2008

**ASSOCIATED CLAIM(s):** 320; Review Due to Hospitalization; 08/22/08
321; Review Due to Hospitalization; 11/25/08

**SUBJECT TO COMPENSATION (J. SC)**

9203            SCHIZOPHRENIC DISORDER, PARANOID TYPE
Service Connected, Peacetime, Incurred
100% from 11/01/1998

### *COMBINED EVALUATION FOR COMPENSATION :*

100% from 11/01/1998

### NOT SERVICE CONNECTED/NOT SUBJECT TO COMPENSATION (8.NSC Peacetime)

7913         DIABETES MELLITUS DUE TO MEDICATION PRESCRIBED FOR
PSYCHOSIS ASSOCIATED WITH SCHIZOPHRENIC DISORDER,
PARANOID TYPE
Not Service Connected, Not Secondary

9411         POST TRAUMATIC STRESS DISORDER [PTSD/Other/Unknown-PTSD]
Not Service Connected, Not Incurred/Caused by Service

Individual Unemployability Denied

### COMPETENCY DECISIONS

Incompetent from 11/07/2006

| Rating Decision | *Department of Veterans Affairs* *Milwaukee VA Regional Office* | | | Page 2 04/15/2009 |
|---|---|---|---|---|
| NAME OF VETERAN Ernest L. Moorer | VA FILE NUMBER 29 615 583 | SOCIAL SECURITY NR 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 | POA WISCONSIN DEPARTMENT OF VETERANS AFFAIRS | COPY TO POA |

### COMPETENCY DECISIONS

Incompetent from 11/07/2006

### ANCILLARY DECISIONS

Basic Eligibility under 38 USC Ch 35 from 11/01/1998

N. Potkonjak, Rating Specialist

K. Endter, Decision Review Officer

Class Syllabus

**CONSTITUTIONAL LAW**
Spring 2006

Prof. Fallone


All assignments are in SHANOR, AMERICAN COSTITUTIONAL LAW: STRUCTURE AND RECONSTRUCTION (2d edition) and the 2005 Supplement to the text.

Class discussion will focus on the cases contained in the assigned readings, the problems presented in the text, or some combination thereof.

OFFICE HOURS. I encourage all of you to avail yourselves of my office hours whenever you have difficulties, questions or concerns. Office hours are Tuesday and Thursday from 1:00 p.m. to 2:00 p.m. in Complex 209. I strongly urge you to make an appointment in advance in order to ensure that you have my uninterrupted attention.

GRADES. Class grades will be based on a closed book exam. In addition, students who are prepared for class and who participate in class discussion may have their final class grade increased by one half letter grade over their exam grade (i.e., from AB to A) in my discretion. There is no penalty for students who do not participate in class discussion.

Assignments

✗   ⟊̸.   Introduction
         pp. xxix-xlv, 1-16

✗   ⟊̸.   Invalidation of Federal Law
         pp. 17-31

✗   ⟊̸.   Invalidation of State Laws
         pp. 31-38

✗   4.    Interpretive Methods
         pp. 38-55
         Supp. Pp. 1-6

✗   5.    Congressional Limits on Judicial Power
         pp. 55-73
         Supp. pp. 6-14

✗   6.    Standing and Mootness
         pp. 73-88

✗   7.    Political Questions
         pp. 88-98
         Supp. pp. 14-26

✗   8.    The Eleventh Amendment Limit
         pp. 98-111

✗  ¹/₃₁  ✗̸.   Separation of Powers
         pp. 111-128

✗  ²/z   10.   Executive Power
         pp. 128-148

✗  ²/₃  11.   Legislative Authority I
         pp. 168-192

✗  ²/₇ ⟊̸.   Legislative Authority II
         pp. 192-209

X  2/9  13.  Congress' Powers
             pp. 210-224

X  2/10 14.  The Commerce Clause
             pp. 224-245

X  2/11 15.  Modern Limits of the Commerce Clause
             pp. 246-264
             Supp. pp. 32-39

X  2/11 16.  Other Article I Powers
             pp. 264-272

X  2/11 17.  State Action
             pp. 272-283

X  2/21 18.  Enforcing the Fourteenth Amendment I
             pp. 283-300

X  2/23 19.  Enforcing the Fourteenth Amendment II
             pp. 300-315
             Supp. pp. 39-48

X  2/24 20.  Federalism
             pp. 316-327

X  2/28 21.  Commandeering the States
             pp. 327-351

   3/2  22.  State Sovereign Immunity
             pp. 351-370

X  3/3  23.  Limits on the States
             pp. 370-388

X  3/7  24.  Protection of Interstate Commerce
             pp. 413-423
             Supp. pp. 51-55

X  3/9  25.  Neutral Statutes Burdening Interstate Commerce
             pp. 424-453

X  3/10  26.  State Privileges and Immunities
              pp. 453-470

X  3/21  27.  Citizenship
              pp. 471-489

X  3/23  28.  Federal Privileges or Immunities
              pp. 490-511

X  3/24  29.  Due Process
              pp. 512-525
              Supp. pp. 58-74

   3/28  30.  Procedure and Substance
              pp. 525-534

   3/30  31.  Substantive Due Process
              pp. 534-555

X  3/31  32.  Personal Rights
              pp. 555-569

X  4/4   33.  Abortion
              pp. 569-592

   4/6   34.  Family and Marriage
              pp. 605-628

   4/7   35.  Homosexuality
              pp. 628-643
              Supp. pp. 75-83

X  4/11  36.  Equal Protection
              pp. 662-673

X  4/13  37.  Race Discrimination
              pp. 673-692

X  4/18  38.  Affirmative Action
              pp. 703-726

$\times$ 4/**20** 39.   Gender and Equal Protection
         pp. 739-762

$\times$ 4/**22** 40.   Fundamental Rights
         pp. 767-789

$\times$ 4/**25** 41.   Rational Review
         pp. 805-831

# FINAL EXAM

## CONSTITUTIONAL LAW

Professor Fallone

Spring 2004

INSTRUCTIONS:

Do not open this exam until instructed to begin.

This is a closed book exam. No outside materials are allowed. No collaboration, consulting or communicating with any other person is allowed.

You will have three (3) hours in which to complete the exam.

There are two fact hypotheticals. The first question is worth 60% of the final score. The second question is worth 40% of the final score. Please allocate your time accordingly. I recommend that you reserve at least one hour for the second question.

I do not care how many blue books you use. I do not care whether you skip lines or skip pages. I do not care what color ink you use. I have only two requests:

1. Please write your anonymous number on all blue books and on your exam.

2. Please write legibly.

Relax. Everyone has the same exam. Read the questions carefully. Organize your thoughts. For each issue: identify the legal rule, apply the facts, and explain your conclusion.

If your answer assumes the existence of certain facts not specified in the problem, identify what those facts are and why you feel those facts are important.

Good luck.

QUESTION ONE (60% of the total score)

The issue of gay marriage has polarized the electorate and inspired demonstrations and public protests on both sides of the issue. Unfortunately, some of these public demonstrations have become violent. For example, a march by supporters of gay rights in Seattle ended in disarray when a group of young "skinheads" attacked the marchers and sent one participant to the hospital. Another recent demonstration, a rally on the steps of the Richmond, Virginia courthouse in favor of gay marriage, was also marred by a scuffle between supporters and opponents of gay rights that slightly injured two demonstrators. Leaders of the gay rights movement have charged that an organized campaign to intimidate homosexuals through the use of violence is behind these and other similar incidents nationwide. Local police and law enforcement officials in each jurisdiction have investigated these and similar incidents, bringing relatively minor assault charges against some of the participants. These officials state that they know of no evidence suggesting the existence of any organized campaign to intimidate homosexuals.

In response to these incidents, Congress has held hearings on the issue of violent acts against homosexuals. At these hearings, several witnesses testified that state and local police do not provide adequate protection for protesters advocating gay rights, despite advance knowledge of the time and location of the public demonstration and the likelihood of counter-demonstrations. These witnesses stated that, in many of the well publicized incidents where violence broke out, an insufficient number of law enforcement officials had been assigned to provide security at the demonstrations and that those few officers who were present did not move aggressively against the anti-gay demonstrators until the situation became out of control. The witnesses suggested that state and local police officers, themselves, often have anti-gay and lesbian feelings and that because of these feelings the police officers purposefully provide inadequate security to pro-gay rights demonstrators.

Members of national gay rights groups, who often work closely with state and local groups to plan demonstrations, testified that they had received anonymous warnings from around the country to "keep out of our state." Members of Congress also heard from the organizers of a planned "March on Washington" by supporters of gay rights who had planned to bus in participants from across the country. These organizers testified that they had to postpone the event due to excessive cancellations from participants who were fearful that violence would break out during the March.

After the hearings, Congress enacted and the President signed the following legislation:

## EQUAL POLICE PROTECTION ACT OF 2004

1. Findings:

   a. Gays and lesbians are disproportionately singled out for violence when they express their political views.

   b. Because of bias against gays and lesbians, state and local police forces often do not provide adequate protection for gays and lesbians; and

   c. Violent crime against gays and lesbians deters gays and lesbians from traveling interstate to express their political views, from using airplanes, trains, buses and other instruments of interstate commerce to do so, and from transacting business with hotels, restaurants and other vendors while traveling.

2. Therefore:

   a. In performing their law enforcement functions, including crime prevention activity and criminal investigation, state and local police forces shall not discriminate based on the sexual orientation of the victim or intended victim of the crime.

   b. Any person who suffers injury because a state of local police force violates section 2(a) of this Act shall have a cause of action to sue the offending state or locality for damages not to exceed $250,000.

   c. In any lawsuit brought to enforce this Act, the state or locality may not assert a defense of sovereign immunity.

A student organization at Marquette University Law School has been formed known as Students United for Gay American Rights ("SUGAR"). The leaders of SUGAR organized a symposium on the issue of gay marriage to take place at a conference center located in Big Foot Beach State Park in Lake Geneva. Several speakers were invited to provide attendees with perspectives on both sides of the legal issue, including Professor Ed Fallone. Professor Fallone is not a member of SUGAR (not that there is anything wrong with that . . .). Prior to the date of the event, SUGAR notified the Wisconsin State Police that its offices in Milwaukee had been vandalized and that the vandals had left a note threatening anti-gay and lesbian violence at the symposium.

Wisconsin State Police usually provide protection for events at state parks. However, on the date of the symposium no police protection was present. Anti-gay rights protestors disrupted the event and, in the ensuing melee, the speaker's platform was overturned and Professor Fallone was injured. He required hospitalization for his injuries and he has threatened to sue SUGAR for negligence.

SUGAR has filed suit in Milwaukee County Circuit Court against the State of Wisconsin alleging a violation of the Equal Police Protection Act of 2004 and seeking damages of $250,000. Discuss the arguments that the State of Wisconsin is likely to make in order to have the lawsuit dismissed, and the likelihood that it will succeed in any of these arguments.

QUESTION TWO (40% of the total score)

Manny Rodriguez had felt uncomfortable "inhabiting a male body" ever since he was in high school. As he grew older, graduating from college and commencing a career in his home state of Wisconsin, he gradually came to the realization that he felt as if he were mentally and emotionally a woman trapped in a man's body. After undergoing therapy and consulting with a doctor, Manny decided to prepare for a sex change operation.

Manny began taking female hormones, and began to dress as a woman. He legally changed his name to Manuela Rodriguez. After a year of hormone treatment, he had breast implant surgery and began using women's restrooms. Finally, two years after commencing the process and after saving money diligently, he was ready for the final step in the transformation of his sexual identity. He scheduled an appointment with a surgeon for an operation that would convert his genitalia from those of a male to those of a female. He also made a $10,000 down payment towards the cost of the surgery (not covered by insurance).

The next morning, he awoke to find the following story in the Milwaukee Journal Sentinel:

## GOVERNOR SIGNS SEX CHANGE BAN

(Madison)    Governor Kwame Jackson today signed legislation making it a felony for any physician, clinic or hospital in the State of Wisconsin to perform "any surgical procedure converting the genitals of a male to those of a female." The Governor strongly denied the assertions of some critics that the new law was motivated by a prejudice against homosexuals, noting that neither the medical community nor the gay rights community consider transgendered individuals to be homosexual. Although opposed to the law in principle, leaders of the gay rights community agreed with the Governor's statement that the new law is not directed towards homosexuals.

In remarks at the signing ceremony, Governor Jackson noted that over 100 "male to female" operations had occurred in Wisconsin in the last year. He justified the fact that the law did not similarly ban "female to male" operations by noting that no comparable surgical procedure has been developed that allows the successful conversion of female genitalia into male genitalia. He indicated that, if

such an operation ever became feasible, he would be open to amending the legislation.

The Governor's remarks noted several justifications for the new law. He stated that the law was necessary in order to prevent tragedies such as the one that befell popular singer Justin Marcini, who died of complications arising out of a sex change operation. He also noted the "widespread belief among the people of Wisconsin" that the legislation was needed to keep mentally unstable men from being mutilated by predatory clinics seeking obscene profits. Governor Jackson closed his remarks by stating, "I am not ashamed to stand before you and say that God created two sexes -- male and female – and that these two sexes are unalterable from birth to death. It is not the place of any man to take it upon himself to alter God's plan." The Governor was elected two years ago on a platform pledging to protect "traditional family values."

Experts reached at Marquette University Law School said that they expect constitutional challenges to the new law.

After reading the above newspaper story, Manny (or Manuela as he/she prefers to be called) has come to your law office seeking advice on the following question: Does the Wisconsin law violate either substantive due process or the equal protection clause of the Constitution? Please respond, and include in your discussion an analysis of whether a lawsuit challenging the legislation on these two grounds would likely succeed.

Note: Please assume that the Governor is correct when he states that no comparable operation exists to convert female genitalia into male genitalia.

On the matter Conservatorship,
Receivership, Gaardeanship

On the matter of legal or
just precedance.

The (5) year rule on
diggners is established

The double-Jeoparly
Sent

Territorial Waters
(1) day of War
Medals
Does not to own
Can not own
Car by VA

He did'nt say he Was
a "Citizen" in a transcript
gaw Case of
right - an offens
& Resist - Arrest that
Red to Mass Convict -

# THE MULLIGAN LAW FIRM

4514 COLE AVENUE, SUITE 300
DALLAS, TEXAS 75205
TELEPHONE: (214) 219-9779
TELECOPIER: (214) 520-8789
E-MAIL: office@mulliganlaw.com
WEB: www.mulliganlaw.com

PATRICK J. MULLIGAN+
ERIC N. ROBERSON*
REID STEWART^
+Licensed in Texas and Georgia
^Licensed in Texas, Colorado, and Oklahoma
*Licensed in Texas

**FINAL NOTICE**
January 3, 2008

Ernest Moorer
3056 N Palmer St Apt 5
Milwaukee, WI 53212

   Re: Zyprexa Litigation

Dear Ernest Moorer:

   Please note that you currently have a lawsuit against Eli Lilly & Company, manufacturers of the drug Zyprexa. The Garretson Law Firm, settlement administrator for your Zyprexa claim, and The Mulligan Law Firm have attempted to contact you regarding your case and the Global Settlement on numerous occasions via telephone and/or mail. To date neither firm has received any response.

   Our office is missing vital information pertaining to your claim. This information could be pharmacy records, medical records, date of birth, social security number, etc. Your claim cannot go forward and you cannot participate in the Global Settlement without this information, therefore, it is imperative that you fill out and return the enclosed document if you wish to continue as a participant in the Zyprexa settlement.

   **Failure to comply with this request will result in you being excluded from the Zyprexa settlement and our firm will file a Notice to Dismiss With Prejudice for Abandonment of Claim.** This means that you will not be able to receive any money from this settlement and that you will be forever barred from participating in your current lawsuit and any future lawsuit concerning Zyprexa.

   Please note that this is the **FINAL COMMUNICATION** from both offices. **ALL PAPERWORK MUST BE IN OUR OFFICE BY JANUARY 15, 2008.**

       Very truly yours,

       **The Mulligan Law Firm**

       Patrick J. Mulligan

Gary A. Glojek
gaglojek@execpc.com

Joseph E. Redding
jredding@execpc.com

William V. Gruber
wgruber@execpc.com

# GLOJEK LIMITED

**Attorneys at Law**
**6212 West Greenfield Avenue**
**West Allis, Wisconsin 53214**
**(414) 774-3414**
**(414) 774-3413 FAX**

Ferd A. Glojek
1937-1987

Friday, February 29, 2008

Ernest L. Moorer
3830 S. 43 rd Street Apt. #23
Milwaukee, WI 53220

RE: Zyprexa drug litigation/settlement

Mr. Moorer:

Please find enclosed herewith a copy of February 26, 2008 correspondence from the law firm of Bailey Perrin Bailey, LLP of Houston, Texas. As anticipated, Bailey Perrin Bailey, LLP are acknowledging that you will not be retaining their services in conjunction with your Zyprexa claims; this letter confirms that this was as per your decision and instruction.

If you should have any questions or concerns, please do not hesitate to contact me.

Very Truly Yours,

WILLIAM V. GRUBER

Enc.

Please note that the enclosed Release is a Full and Final Release of ALL of your claims and/or causes of actions against the Released Parties (as set out in the footnote below), whether known or unknown, arising out of, relating to, resulting from, or in any way connected with Zyprexa. **Under the terms of the enclosed Release, you will also be releasing any claims you may have against any physicians, healthcare providers, medical facilities, or hospitals who may have treated you or from whom you may have sought treatment in connection with your use of Zyprexa, and any pharmacy, physician, medical facility, or health care provider from whom you obtained Zyprexa.**

By signing the enclosed Release, you are agreeing to accept the settlement money offered by Lilly and, in exchange, are giving up your right to a trial against Lilly and the other Released Parties.[1] Of course, trial is risky because you could win or lose your case. If you go to trial, the jury could award you more, less, or no money against these Defendants. In addition, even if you are successful at trial, a Defendant always has the right to appeal your jury award. The appeal process may take anywhere from two to three years to complete and would result in additional costs and expenses in your case. Any money awarded by the jury would not be paid to you until the appeal process is complete and a finding has been made in your favor. Further, an appeal could also result in a new trial being ordered and the entire litigation process would then start over again.

It is also important for you to remember that the amount being offered to you by this letter is the "gross value" of your Zyprexa settlement offer. As with all settlements, expenses and attorney fees will be deducted from this settlement amount before a check is issued to you. Moreover, liens may exist on your settlement proceeds. If we are notified that there is a valid outstanding lien on any of your settlement money, we will inform you so that the lien may be resolved with the lien holder when your settlement money is disbursed to you. **You should also note that under the terms of the enclosed Release, you are agreeing to be responsible for any other liens (such as for Medicare or Medicaid reimbursements) based on any hospital or medical expenses incurred in connection with, or arising out of, any diabetes-related injuries you have suffered as a result of your ingestion of Zyprexa.**

**I also want to remind you that you must keep the terms of this settlement confidential and must not disclose these terms, including the settlement amount, to anyone except your accountant and/or financial advisors.**

Finally, we would like to take this opportunity to address a very important issue regarding settlement money that may be received for your Zyprexa claims. Depending upon the law of the state in which you live, you may be required to report settlement money if you are receiving or seeking to receive financial assistance through a state or federal government program such as SSI, Medicaid, or another need-based government benefit program. Many states

---

[1] The enclosed Release extends to "all Zyprexa-related claims against named defendants in pending (or previously dismissed) Zyprexa-related litigation and all other third parties in any way connected with Claimant's use of Zyprexa, including without limitation, physicians, health care providers, hospitals, pharmacies and other medical facilities, their past, present, and future parents, subsidiaries, affiliates, controlling persons, suppliers, distributors, agents, assigns, counsel and insurers, and all of their past, present and future officers, directors, employees, shareholders, predecessors, successors, assigns, heirs, estate administrators, or personal representatives (or the equivalent thereto)."

impose a general cap on allowed income and assets in determining eligibility for benefits. Therefore, settlement money may be an important factor for purposes of determining your eligibility to receive or continue to receive benefits and whether a period of ineligibility for benefits is applicable in your case. Also, there may be specific state and federal statutes and regulations with which you must comply. Some state and federal laws allow for the creation of Special Needs Trusts which can be set up to receive settlement proceeds and protect an individual's rights to receive and/or continue to receive financial assistance and benefits. **If you are currently receiving or seeking to receive SSI, Medicaid, or any other need-based government benefits, we strongly advise you to contact immediately an attorney who specializes in government benefits, estate planning, or elder law, such as the lawyers with Special Needs Alliance (1-877-572-8472) to provide you further information and assist you in this area.** These professionals can advise you on the options available to you for preserving your government benefits. Let us again stress that early action (**prior to settlement of your Zyprexa claims** and disbursement of money to you) may be necessary for you to avoid becoming ineligible for benefits or having benefits temporarily interrupted or completely denied.

If you have any questions or concerns regarding this settlement offer or any of the enclosed documents, or if there is anything that you do not understand about this settlement, please contact us at (888) 222-7052.

Sincerely,

David P. Matthews

Enclosures

## *ACKNOWLEDGEMENT*

*I agree to the terms of the settlement offer described in this letter and in the enclosed "Description of Settlement."*

---

*Ernest Moorer*
*DATE*

## CLIENT'S ACKNOWLEDGMENT OF CO-COUNSEL

I hereby acknowledge that my attorney, Jim Adler, retained the attorney(s) listed below to assist with the litigation and/or settlement of my Zyprexa claims against Eli Lilly and Company.

**I UNDERSTAND THAT THE PERCENTAGE OF MY TOTAL SETTLEMENT THAT I PAY AS ATTORNEY FEES WILL *NOT* BE HIGHER THAN THE PERCENTAGE STATED IN THE CONTRACT I ORIGINALLY SIGNED.** I further understand that the attorneys listed below will share the total fees I originally agreed to pay.

The *attorneys' fees only* are subject to a fee splitting agreement as follows:

| | |
|---|---|
| Jim Adler | 50% of the total attorneys' fees |
| Matthews & Associates | 50% of the total attorneys' fees |

I understand that the additional attorneys listed above were retained on my behalf because they have special expertise and experience that were expected to be of benefit to me in the litigation and/or settlement of my Zyprexa case.

I further understand that the fees to be paid to the above co-counsel for assisting with this matter will be paid entirely by my attorney, and will NOT in any way alter the fee agreement I have with my attorney. That is, the above co-counsel's assistance with this matter will NOT cost me any additional attorneys' fees beyond those I originally agreed to pay my attorney.

Finally, I understand that in order to provide the best possible assistance with the litigation and/or settlement of my Zyprexa case, my attorney may have provided some or all of the above-listed attorneys confidential or other information that he/she believed would be of use to the co-counsel in assisting with the litigation and/or settlement of my Zyprexa case.

_____     _____
[client's signature]                              [date]

Name: Ernest Moorer;  Case Number: 247882

# Acknowledgment Regarding Financial Information

**I understand that the attorneys and law firms that have assisted me in pursuing my Zyprexa claims against Eli Lilly and Company do not provide advice or assistance with regard to Structured Settlements, government benefits matters, or other financial or tax issues.**

I understand that there is information that it may be useful for me to have regarding my options for receiving my settlement proceeds and the effect that receipt of my settlement proceeds may have on my eligibility for certain government benefits.

I acknowledge that I have had the opportunity -- at no charge to me -- to speak with the professionals at the Special Needs Alliance at (877) 572-8472, or to consult another financial professional or attorney of my choice, to discuss any questions I might have regarding the tax implications and other aspects of my different options for receiving my settlement monies and/or protecting my government benefits.

**I believe I have sufficient information at this time to make an informed and voluntary decision regarding the receipt of my settlement monies, and I elect the following (CHOOSE ONE ONLY):**

____ To receive my <u>entire settlement</u> as a lump-sum, cash payment;

> **By electing a lump-sum, cash payment, I understand that I may no longer be eligible to receive Medicaid, SSI, or other need-based government benefits that I currently receive.**

____ To structure <u>some or all</u> of my settlement proceeds for financial planning and tax reasons; or

____ To structure my settlement proceeds to protect my Medicaid, SSI, or other need- based government benefits.

**If you are interested in structuring your settlement proceeds for the protection of need-based benefits, you should contact the Special Needs Alliance at (877) 572-8472 or a local attorney of your choice who specializes in this area. Your State Bar Association (see your local Yellow Pages for phone number) may be able to refer you to an appropriate attorney.**

_____     _____
Claimant Signature                  Date

## Zyprexa Settlement Amount

I, **Ernest Moorer** individually and on behalf of all derivative claimants under applicable law, do hereby agree to accept a minimum gross settlement of **$8,920.80** in full and final release of all of my Zyprexa related claims. **Attorneys' fees, expenses, and any appropriate lien amounts will be deducted, from the gross settlement and the balance along with accrued interest will be subsequently paid to me.**

I understand that under the terms of the Master Settlement Agreement, my attorneys are obligated to supply Eli Lilly with a final list of claimants ("final list of claimants"), which includes each claimant's final gross settlement amount. I also understand that the gross settlement amount reflected on the final list of claimants may be more than the amount specified above and hereby accept the higher gross settlement amount, if applicable, reflected on the final list of claimants.

_____

**Ernest Moorer** individually and on behalf of and all derivative claimants under applicable law

_____
Date

I, David P. Matthews, hereby also represent and declare that Claimant, has at all relevant times, been represented by Claimants' counsel. Claimants' counsel have provided Claimant a copy of the Confidential Release, and Claimants' Counsel have made themselves available to answer any and all questions with respect to the substance of the Confidential Release. Having had a full opportunity to read, understand, and inquire of their counsel about the terms and conditions of the Confidential Release, neither Claimant nor Claimants' Counsel has an objection to the terms of this Confidential Release.

_____          _____
By Counsel for Claimant (Signature)                              Date

David P. Matthews or his agent
By Counsel for Claimant (PRINT NAME)

## Clarification Regarding Expense Reimbursement

Client understands that the Attorneys representing him/her in the Zyprexa litigation represent numerous other similarly injured clients.

As stated in Client's original Zyprexa contract with his/her Attorney(s), no expenses are to be reimbursed by the Client unless and until Client ultimately receives compensation in this matter, whether through settlement or after a trial.

Client understands that some of the expenses incurred by Attorneys in the Zyprexa litigation benefit only a particular client (for example, the cost of obtaining a particular client's medical records or the cost of filing a particular client's case in court). These are sometimes called "case specific" expenses. Other expenses, however, benefit a larger group of clients; these are sometimes called "general case expenses" or "group expenses." Such group expenses include, but are not necessarily limited to: retaining and compensating experts; computerized document management; conference calls; travel and other costs relating to the depositions of defendants' representatives, witnesses, experts, and agents; certain postage and photocopying expenses; computerized legal research. Each client in the relevant group further benefits from the ability to share these expenses with the larger group, rather than incurring these expenses individually.

Client understands that the term "expenses" in his/her original Zyprexa contract with the Attorney(s) incorporates both individual and group expenses, as explained further above, and that group expenses will be allocated as appropriate among the relevant group of benefited clients.

By signing below, Client acknowledges that he/she has read and understands the above, has had the opportunity to discuss with Attorneys any questions he/she may have, and has no further questions or concerns about the above at this time.

_____          2/7/08
([client's signature])                          [date]

Name: Ernest Moorer; Case Number: 247882

# MATTHEWS & ASSOCIATES

ATTORNEYS & COUNSELORS AT LAW

2905 Sackett Street
Houston, Texas 77098

www.thematthewslawfirm.com

713/222-8080
888/222-7052
Fax 713/535-7184

DAVID P. MATTHEWS, J.D. *‡°
JULIE L. RHOADES, J.D. ‡
LIZY SANTIAGO, J.D. †
JASON C. WEBSTER, J.D. °
C.F. JEB WAIT, M.D. J.D. – OF COUNSEL ±

January 8, 2008

* BOARD CERTIFIED: PERSONAL INJURY TRIAL LAW
  TEXAS BOARD OF LEGAL SPECIALIZATION
† LICENSED IN TEXAS
° LICENSED IN TEXAS AND MISSISSIPPI
‡ LICENSED IN TEXAS AND NEW YORK STATE
± LICENSED IN TEXAS AND WEST VIRGINIA

Ernest Moorer
3056 N. Palmer St. #5
Milwaukee, WI 53212

RE:     Your Zyprexa® Claim

Dear Client:

We are pleased to inform you that we have negotiated a group settlement with Eli Lilly and Company (hereinafter "Lilly") that enables you to receive $   8,920.80 (GROSS value -- before attorneys' fees and expenses are deducted) for your Zyprexa claims. A description of the larger Settlement Agreement that Lilly has entered into with Matthews & Associates ("Lead Plaintiffs' Counsel") is set forth in the attached "Description of Settlement Agreement."

Your minimum gross settlement amount was calculated based on the information we have for the Zyprexa user, as follows:

| Date Zyprexa first used: | 9/2/2003 |
|---|---|
| Zyprexa first used prior to September 16, 2003? | Y |
| Diabetes related injury: | Insulin Dependent Diabetes (Diabetes controlled by regular use of Insulin) |
| Date and age diagnosed: | 9/11/2003; 42 |
| Diagnosed with diabetes BEFORE using Zyprexa? | No |
| Pre-existing Diabetes Mellitus; change in injury category (50% reduction) | Y |
| Pre-existing Diabetes Mellitus; change in medication only (75% reduction) | N |
| Pre-existing Diabetes Mellitus; no change in medication; (95% reduction) | N |
| **Risk Factors:** Patient used Seroquel before the diagnosis of diabetes related injury? (30% reduction) | yes |
| **Risk Factors:** Patient has a family history of diabetes? (10% reduction) | N |

Because Lilly and Lead Plaintiffs Counsel are still in the process of resolving the precise list of Claimants to be included in this settlement and the total gross dollars to be paid by Lilly for those claims, we can only know at this time your above-listed minimum gross settlement

Name: Ernest Moorer;   Case Number: 247882

offer. Once all the terms of the settlement are final, however, we expect that each Claimant who accepts his/her settlement offer will ultimately receive *an additional gross payment* (before attorneys' fees and expenses are deducted) *totaling approximately 5-10 percent of his/her minimum gross settlement offer amount set forth above, with appropriate adjustments*.

**You are free to accept or reject this settlement offer, but we strongly recommend that you accept it.** We believe that this is a fair settlement offer for your claim given the injury you have suffered, your proof of Zyprexa usage, other relevant aspects of your individual case, the likelihood of (and likely gross amount of) any recovery on your behalf at trial, and the cost of trying your case, which ultimately you would bear. In our opinion, this is the best opportunity to receive fair compensation for your claims in the foreseeable future.

**If you choose to follow our recommendation and accept this offer, you should carefully review all of the enclosed documents, and then do ALL of the following:**

- sign the enclosed Release
- complete and sign the enclosed "Acknowledgment Regarding Financial Information"
- sign the enclosed "Client's Acknowledgment of Co-Counsel"
- complete and sign the enclosed "Client's Statement Regarding Bankruptcy, Medicare and Medicaid Benefits, and Medical Liens"
- sign this letter where indicated below
- **Provide a copy of your Drivers License, ID Card, or any other official documentation showing that you are a U.S. Resident. Under the terms of the Agreement with the Defendant, only U.S. Residents are eligible to participate in this settlement.**

**Make a copy for your records and return ALL FIVE original (5) signed documents, plus the copy of your Drivers License (or other proof of U.S. residency) to me** in the enclosed envelope as soon as possible. Please return ALL PAGES of all five (5) documents so that processing of your claim will not be delayed. PLEASE KEEP A COPY FOR YOUR OWN FILES. Please complete and return all of the enclosed documents, even if you have previously completed and returned some of these documents as part of a separate mailing.

If you currently have a bankruptcy proceeding pending or if you have been involved in bankruptcy proceedings at any time after you first began taking Zyprexa, Please call us as soon as possible. You CANNOT sign the enclosed Release without talking with us first. Once you contact us, we will discuss with you what we need to do to finalize your settlement, given the facts of your particular bankruptcy case.

Once you return the enclosed documents, we will submit them to Eli Lilly, for final approval along with your medical records. Returning your own properly-executed documents to me in the enclosed envelope is the best way to ensure that you receive payment for your claim as quickly as possible.

Your claim must receive final approval by the Defendant before any settlement monies can be paid to you. Although the final approval process can be lengthy, we anticipate you will receive your settlement within 90 days.

**CLIENT'S STATEMENT REGARDING BANKRUPTCY,
MEDICARE AND MEDICAID BENEFITS, AND MEDICAL LIENS**

I hereby affirm that the following is true:     **PLEASE PUT AN "X" BY ONLY ONE OF THE FOLLOWING:**

___  I am currently involved in **bankruptcy proceedings** or have filed for bankruptcy in the past.
     If so, please list when and where the bankruptcy was filed:
     _____ (date)
     _____ (county and state)

**OR**

___  I am NOT currently involved in **bankruptcy proceedings** and have never filed for bankruptcy in
     the past.

************************************************************

I hereby affirm that the following is true:     **PLEASE PUT AN "X" BY ONLY ONE OF THE FOLLOWING:**

___  I currently receive **Medicare benefits** from the government, or have received Medicare benefits
     from the government in the past, and my Medicare number is _____ _____.

**OR**

___  I do NOT currently receive **Medicare benefits** from the government and have never received such
     benefits from the government.

************************************************************

I hereby affirm that the following is true:     **PLEASE PUT AN "X" BY ONLY ONE OF THE FOLLOWING:**

___  I currently receive **Medicaid benefits** from the government, or have received Medicaid benefits
     from the government in the past, and my Medicaid number is _____ _____.

**OR**

___  I do NOT currently receive **Medicaid benefits** from the government and have never received such
     benefits from the government.

************************************************************

I hereby affirm that the following is true:     **PLEASE PUT AN "X" BY ONLY ONE OF THE FOLLOWING:**

___  To the best of my knowledge, I (or the Deceased, as appropriate) DO (DOES) currently owe
     money to any hospital, medical provider, or the Federal or any state government for medical
     services received in connection with my (or the Deceased's) Zyprexa-related injuries and/or
     illnesses.

**OR**

___  To the best of my knowledge, I (or the Deceased, as appropriate) DO (DOES) NOT currently owe
     money to a hospital, medical provider, or the Federal or a state government for medical services
     received in connection with my (or the Deceased's) Zyprexa-related injuries and/or illnesses.

****************************************************************************************
I HEREBY ACKNOWLEDGE AND SWEAR THAT THE INFORMATION I PROVIDED ABOVE IS TRUE
AND CORRECT.


_____          _____
[client's signature]                          [date]

## Clarification Regarding Expense Reimbursement

Client understands that the Attorneys representing him/her in the Zyprexa litigation represent numerous other similarly injured clients.

As stated in Client's original Zyprexa contract with his/her Attorney(s), no expenses are to be reimbursed by the Client unless and until Client ultimately receives compensation in this matter, whether through settlement or after a trial.

Client understands that some of the expenses incurred by Attorneys in the Zyprexa litigation benefit only a particular client (for example, the cost of obtaining a particular client's medical records or the cost of filing a particular client's case in court). These are sometimes called "case specific" expenses. Other expenses, however, benefit a larger group of clients; these are sometimes called "general case expenses" or "group expenses." Such group expenses include, but are not necessarily limited to: retaining and compensating experts; computerized document management; conference calls; travel and other costs relating to the depositions of defendants' representatives, witnesses, experts, and agents; certain postage and photocopying expenses; computerized legal research. Each client in the relevant group further benefits from the ability to share these expenses with the larger group, rather than incurring these expenses individually.

Client understands that the term "expenses" in his/her original Zyprexa contract with the Attorney(s) incorporates both individual and group expenses, as explained further above, and that group expenses will be allocated as appropriate among the relevant group of benefited clients.

By signing below, Client acknowledges that he/she has read and understands the above, has had the opportunity to discuss with Attorneys any questions he/she may have, and has no further questions or concerns about the above at this time.

_____          _____
[client's signature]                                                      [date]

| J. | 66 years old or older --<br>*approximately 37 claimants | $6,690.60 per claimant |

Group 3 -- Type II Diabetes Mellitus – Diet-Controlled/No Medication

| A. | 25 years old or younger --<br>*approximately 6 claimants | $16,726.50 per claimant |
| B. | 26 to 30 years old --<br>*approximately 3 claimants | $16,248.60 per claimant |
| C. | 31 to 35 years old --<br>*approximately 8 claimants | $15,531.75 per claimant |
| D. | 36 to 40 years old or younger --<br>*approximately 8 claimants | $14,575.95 per claimant |
| E. | 41 to 45 years old --<br>*approximately 24 claimants | $13,381.20 per claimant |
| F. | 46 to 50 years old --<br>*approximately 12 claimants | $11,947.50 per claimant |
| G. | 51 to 55 years old or younger --<br>*approximately 22 claimants | $10,274.85 per claimant |
| H. | 56 to 60 years old --<br>*approximately 8 claimants | $8,363.25 per claimant |
| I. | 61 to 65 years old --<br>*approximately 4 claimants | $5,973.75 per claimant |
| J. | 66 years old or older --<br>*approximately 7 claimants | $3,345.30 per claimant |

Group 4 -- Hyperglycemia

| A. | 25 years old or younger --<br>*approximately 7 claimants | $10,035.90 per claimant |
| B. | 26 to 30 years old --<br>*approximately 5 claimants | $9,717.30 per claimant |
| C. | 31 to 35 years old --<br>*approximately 4 claimants | $9,239.40 per claimant |
| D. | 36 to 40 years old or younger --<br>*approximately 5 claimants | $8,602.20 per claimant |
| E. | 41 to 45 years old --<br>*approximately 3 claimants | $7,805.70 per claimant |
| F. | 46 to 50 years old --<br>*approximately 5 claimants | $6,849.90 per claimant |

| G. | 51 to 55 years old or younger -- *approximately 4 claimants | $5,734.80 per claimant |
| H. | 56 to 60 years old -- *approximately 3 claimants | $4,460.40 per claimant |
| I. | 61 to 65 years old -- *approximately 2 claimants | $2,867.40 per claimant |
| J. | 66 years old or older -- *approximately 2 claimants | $1,115.10 per claimant |

Group 5 -- Pancreatitis (Other Causes Excluded)

| A. | 25 years old or younger -- *approximately 3 claimants | $6,690.60 per claimant |
| B. | 26 to 30 years old -- *approximately 4 claimants | $6,531.30 per claimant |
| C. | 31 to 35 years old -- *approximately 4 claimants | $6,292.35 per claimant |
| D. | 36 to 40 years old or younger -- *approximately 7 claimants | $5,993.75 per claimant |
| E. | 41 to 45 years old -- *approximately 10 claimants | $5,575.50 per claimant |
| F. | 46 to 50 years old -- *approximately 9 claimants | $5,097.60 per claimant |
| G. | 51 to 55 years old or younger -- *approximately 4 claimants | $4,540.05 per claimant |
| H. | 56 to 60 years old -- *approximately 2 claimants | $3,902.85 per claimant |
| I. | 61 to 65 years old -- *approximately1 claimant | $3,106.35 per claimant |
| J. | 66 years old or older -- *approximately 2 claimants | $2,230.20 per claimant |

Criteria for Additional Payment

Claimants are eligible to receive additional minimum settlement dollars (above and beyond the minimum base category amounts set forth above) if they are deceased and their death was determined to be related to Type II Diabetes Mellitus, or if they were less than 18 years of age and were diagnosed with Type II Diabetes Mellitus after the use of Zyprexa:

**If You Have Any Questions**

We invite you to visit our website at www.socialsecurity.gov on the Internet to find general information about Social Security. If you have any specific questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at 1-414-297-1790. We can answer most questions over the phone. If you are deaf or hard of hearing, you may call our TTY number, 1-800-325-0778. You can also write or visit any Social Security office. The office that serves your area is located at:

> SOCIAL SECURITY
> SUITE 260
> 310 W WISCONSIN AVE
> MILWAUKEE, WI 53203

If you do call or visit an office, please have this letter with you. It will help us answer your questions. Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

Carolyn L. Simmons
Associate Commissioner for
Central Operations

include claimants who ultimately choose not to participate in this settlement or who are determined to have been miscategorized in some way.

## Total Value of Settlement

Based on the above listing of settlement offer values and approximate numbers of eligible claims per category, the total of the *minimum* settlement offer values will be approximately, $28,889,246 for the 1,479 Claimants about whom Lilly and Lead Plaintiffs' Counsel have thus far reached agreement. The precise total value of this settlement cannot be known until Lilly and Lead Plaintiffs' Counsel finalize an agreed list of the Claimants to be included in this settlement and the total gross dollars to be paid by Lilly for those claims. Of course, the total value of this settlement will ultimately be affected by the number and value of the claims of any individuals eligible to participate in this settlement who ultimately choose not to settle.

## Attorneys' Fees and Litigation Costs

The attorneys' fees to be paid by each settling Claimant are consistent with those set forth in the Claimant's attorney-client contract. The total expenses to be reimbursed by a settling Claimant will be reflected on a "Disbursement Statement," which will be mailed along with each Claimant's settlement check. Those reimbursable expenses will include case-specific and general expenses. Case-specific expenses are those that benefit a specific client (e.g., the costs of obtaining a particular client's medical or pharmacy records). General expenses are those that benefit a larger group of clients (e.g., the fees paid a medical expert on Zyprexa). General expenses are allocated on a pro-rata basis across the group of benefited clients.

## Acceptable Proof Requirement for Settlement Payment

In order for you to receive payment under the Settlement Agreement, we will need to provide Lilly: **acceptable proof that you are a U.S. resident and were prescribed Zyprexa; acceptable proof that you have sustained a compensable Diabetes-related injury; and the appropriate "Confidential Release" signed by you in the presence of a Notary Public.** We will also need to have received from you, properly completed and signed, all of the other enclosures sent to you with this document.

**There is no need for you to contact us regarding proof of your Zyprexa prescription or proof of your medical condition or injuries. We believe we already have this information for you, and we will contact you if we need further information from you.**

## Right of Termination

Under the terms of the Settlement Agreement, Lilly retains the right to terminate this Agreement if more than a certain number of covered claimants do not timely provide us a properly executed "Confidential Release."

## Confidentiality

The terms of the Settlement Agreement are confidential. Under the terms of the enclosed Release, you must not disclose the terms of this Settlement, including your settlement offer amount, to anyone except your accountant and/or financial advisors. In addition, the identity of each of the Claimants covered by this Settlement Agreement is not set forth in this summary to protect his/her privacy. If you nonetheless wish to have further information about other Claimants included in this

Name: Ernest Moorer; Case Number: 247882

settlement, please contact us, and we will make appropriate information available to you in a way that we hope will still protect the privacy of each of our clients.

# Description of Settlement Agreement

Eli Lilly and Company (hereinafter "Lilly") manufactured and distributed "Zyprexa." Lilly has entered into a Settlement Agreement with David P. Matthews, Esq. (hereinafter "Lead Plaintiffs' Counsel") regarding the settlement of the claims against Lilly of individuals for whom Lead Plaintiffs' Counsel serves as counsel or co-counsel and who allege personal injury and/or death as a result of ingestion of "Zyprexa"

## Settlement Offer Values

We individually evaluated each Claimant's[2] case in light of its individual circumstances and a consideration of various factors including: the claimant's diagnosis, the claimant's age, and whether any confounding factors (as summarized below) were present. We negotiated a provisional total settlement with Lilly of $42,100,000 for all Zyprexa claims represented by Lead Plaintiffs' Counsel.

Lilly and Lead Plaintiffs' Counsel are in the process of finalizing an agreed list of the Claimants to be included in this settlement and the total gross dollars to be paid by Lilly for those claims.

The amounts listed below therefore, which total approximately, $28,889,246 are *minimum* gross settlement offer amounts (before attorneys' fees and expenses are deducted) for the 1,479 Claimants about whom Lilly and Lead Plaintiffs' Counsel have thus far reached agreement. In addition, the claims of approximately 266 Claimants are still being evaluated by Lilly and Lead Plaintiffs' Counsel for possible inclusion in this settlement. Any such Claimants ultimately included in the settlement will receive the appropriate *minimum* settlement offer amount set forth below, with relevant adjustments. Once Lilly and Lead Plaintiffs' Counsel reach agreement about the precise list of Claimants to be included in this settlement and the total gross dollars to be paid by Lilly for those claims, it is expected that each Claimant who accepts his/her settlement offer will receive an *additional gross payment* (before attorneys' fees and expenses are deducted) totaling *approximately* 5-10 percent of his/her minimum gross settlement offer amount set forth below, with appropriate adjustments.

A Claimant's minimum gross settlement offer amount (before attorneys' fees and expenses are deducted) can be determined by finding the injury "group" (1 through 5) to which the Claimant belongs below, then finding the age subcategory (A through J) within that group. This amount is the "base" amount to which any additional payments (as itemized below) for which the Claimant qualifies are then added. Finally, we evaluated each claimant's case for confounding factors, and a final adjustment to (i.e., reduction of) the settlement offer value was made, if appropriate; these deductions are also set forth in detail below.

We believe that each Claimant's minimum gross settlement offer under this Settlement Agreement fairly reflects the results of our evaluation of the circumstances of each individual case. If you have any questions regarding the claim valuation process, the value of your claim, or any aspect of the information provided in this "Description of Settlement" document, please feel free to contact us.

| Group 1 -- | Insulin-Dependent Type II Diabetes Mellitus | |
| --- | --- | --- |
| A. | 25 years old or younger -- <br> *approximately 15 claimants | $55,755.00 per claimant |
| B. | 26 to 30 years old -- | $54,162.00 per claimant |

---

[2] Throughout this document, the "Claimant" means the person, whether living or deceased, who has or had qualifying Zyprexa usage, and who is represented by Lead Plaintiffs' Counsel, either directly or through his/her estate, in the Zyprexa litigation.

*approximately 27 claimants

| | | |
|---|---|---|
| C. | 31 to 35 years old -- <br> *approximately 44 claimants | $51,772.50 per claimant |
| D. | 36 to 40 years old or younger -- <br> *approximately 50 claimants | $48,586.50 per claimant |
| E. | 41 to 45 years old -- <br> *approximately 85 claimants | $44,604.00 per claimant |
| F. | 46 to 50 years old -- <br> *approximately 60 claimants | $39,825.00 per claimant |
| G. | 51 to 55 years old or younger -- <br> *approximately 38 claimants | $34,249.00 per claimant |
| H. | 56 to 60 years old -- <br> *approximately 25 claimants | $27,877.50 per claimant |
| I. | 61 to 65 years old -- <br> *approximately 8 claimants | $19,912.50 per claimant |
| J. | 66 years old or older -- <br> *approximately 11 claimants | $11,151.00 per claimant |

Group 2 --    Non-Insulin-Dependent Type II Diabetes Mellitus

| | | |
|---|---|---|
| A. | 25 years old or younger -- <br> *approximately 19 claimants | $33,453.00 per claimant |
| B. | 26 to 30 years old -- <br> *approximately 39 claimants | $32,497.20 per claimant |
| C. | 31 to 35 years old -- <br> *approximately 97 claimants | $31,063.50 per claimant |
| D. | 36 to 40 years old or younger -- <br> *approximately 138 claimants | $29,151.90 per claimant |
| E. | 41 to 45 years old -- <br> *approximately 175 claimants | $26,762.40 per claimant |
| F. | 46 to 50 years old -- <br> *approximately 167 claimants | $23,895.00 per claimant |
| G. | 51 to 55 years old or younger -- <br> *approximately 141 claimants | $20,549.70 per claimant |
| H. | 56 to 60 years old -- <br> *approximately 61 claimants | $16,726.50 per claimant |
| I. | 61 to 65 years old -- <br> *approximately 53 claimants | $11,947.50 per claimant |

## RETAINER AGREEMENT

As signed below, this agreement is made on the 5th day of January, 2006, between Capshaw, Goss & Bowers, L.L.P. ("CGB") and Tamara L. Banno, P.C. ("TLB"), hereinafter referred to as "Attorneys" and **ERNEST L. MOORER,** hereinafter referred to as "Client" involving a civil damages claim for personal injury as the result of Client's use of Zyprexa. Client and Attorneys agree as follows:

1) Client agrees to pay as compensation for Attorneys' services 40% of all claims or recoveries from and against all sources, persons, or entities, prior to the time a lawsuit is filed, or 45% of all claims or recoveries from and against all sources, persons, or entities, obtained after a lawsuit is filed, whether actually tried before a judge or jury or not. The percentages referenced in this paragraph will be calculated on and subtracted from the gross amount of any recovery obtained *before* deducting any outstanding expenses, incurred by our firms or any referring firm.

2) Our firm will assume joint responsibility for your representation, and the division of the attorneys' fees (described above), between our firms, and other co-counsel will be based upon that joint representation. The fee sharing arrangement will be: one-third to the Law Office of Daniel Kondos and two-third fee to CGB and TLB. In addition, the 2/3 fee to CGB and TLB may be shared with Sweet & Freese, PLLC and/or Gallagher, Downey, Lewis & Kim. That fee if any, would be shared based upon percentages to be agreed upon at the conclusion of the case in accordance with the work performed by the attorneys including attorneys hours, experience, case origination efforts, and expenses incurred by said firm. **This does not affect the amount of attorneys fees or expenses that will be deducted from your recovery, if any, as set forth in paragraph 1.**

3) It is further agreed that Attorneys shall advance all legal costs and expenses directly related to this action. Costs and expenses advanced by Attorneys shall be deducted from the total recovery. If no recovery is obtained, no costs or expenses shall be payable by Client. Expenses include, but are not limited to, travel, meals, lodging, deposition charges, expert witness fees and costs, investigation expenses, computer research services, long-distance phone charges, service of process and subpoena fees, court costs and fees, jury fees, postage, copy charges, photographic reproduction. preparation of trial exhibits, and all other out-of-pocket expenses incurred by the Attorneys arising out of the representation of the Client. The Attorneys will maintain an itemized statement of all expenses.

4) If the client's claim includes reimbursement for medical expenses incurred in treating the injury made the basis of the claim, the client may, by contract or statute, be required to repay to the party who paid the medical expenses part or all of those amounts (i.e. subrogation). This is the client 's obligation, and such repayment, if any, shall be the client's responsibility and shall be paid out of the client' s settlement proceeds. If a dispute arises between the client and a subrogee or lien holder, the client agrees to allow the attorney to hold the maximum amount being claimed in an escrow account until such dispute has been resolved.

5) Attorneys are hereby authorized to bring suit when and in any matter they deem advisable; however, the consent of the above named client must be secured before any final settlement is made. Further, client empowers attorneys to take all steps in said matter deemed by attorneys to be advisable, including but not limited to effectuating a compromise. institute legal proceedings and to take any other appropriate steps.

6) Client, hereby gives Attorneys. client's power of attorney to execute all documents connected with the claim for the prosecution of which the attorneys are retained. including pleading. contracts. checks or drafts. settlement agreements, compromises and releases, verifications. dismissals. and orders and all other documents which client could properly execute

Agreement entered into and signed this $10\underline{^{th}}$ day of November, 1984.

Raymond J. Papke, Grantor

Virginia M. Papke, Grantor

David R. Papke, Trustee

STATE OF _Wisconsin_ )
                      ) SS:
COUNTY OF _Milwaukee_ )

     Before me the undersigned, a Notary Public in and for said County and State, personally appeared Raymond J. Papke, and he being first duly sworn by me upon his oath, says that the facts alleged in the foregoing instrument are true. Signed and sealed this _10_ day of November, 1984.

(SEAL)

My Commission Expires:
_Aug 3, 1986_

Notary Public

My County of Residence:
_Milwaukee_

STATE OF _Wisconsin_ )
                      ) SS:
COUNTY OF _Milwaukee_ )

     Before me the undersigned, a Notary Public in and for said County and State, personally appeared Virginia M. Papke, and she being first duly sworn by me upon her oath, says that the facts alleged in the foregoing instrument are true. Signed and sealed this _10th_ day of November, 1984.

(SEAL)

My Commission Expires:
_Aug 3rd 1986_

Notary Public

My County of Residence:
_Milwaukee_

business hours by the Grantors, by the Beneficiary, or by any person or persons designated by any one of them. The Trustee shall furnish written statements at least annually showing the itemized receipts and disbursements of income and principal of the trust, and otherwise reflecting the condition thereof, to the Grantors, while they or either of them is living, and after they are both deceased, then to the Beneficiary.

D. Responsibilities of Successor Trustees. A successor Trustee shall have no duty to examine the acts of any prior fiduciary, and any successor Trustee shall be responsible only for those assets which are actually delivered to a successor Trustee by the prior Trustee, a successor Trustee shall have the same estates, titles, powers, duties, immunities, and discretions granted to the prior Trustee.

E. Liability of Trustee. Any trustee may rely upon the written opinion of a competent attorney, any facts stated in any instrument in writing and reasonably believed true or any other evidence deemed sufficient. No Trustee shall incur any liability for any action such Trustee may take, or for the failure of such Trustee to take any action, if done in good faith and without gross negligence.

15. Intent of Grantor. Notwithstanding any of the other provisions of this Agreement, it is the intention of the Grantor that any transfers of property to the trust created hereunder shall be a completed gift under federal and state gift tax laws, qualifying for the per donee annual exclusion under §2503 of the of the Internal Revenue Code, or any subsequently adopted similar legislation, and that the income from the property transferred to such trust shall be taxed to the trust or to the Beneficiary. Therefore, any provisions of this Agreement which interfere with that intent shall be disregarded or shall be applied in a reasonable manner so as to achieve these objectives.

16. Definition and References. The term "descendant" or "descendants" in this Agreement means the lawful, lineal blood descendants of the person referred to and shall include an adopted child of the person referred to and such adopted child's lawful lineal descendants by blood or adoption.

17. Governing Law. The validity, effect and interpretation of this instrument and the administration of the trusts created under this Agreement shall be determined by the laws of the State of Indiana.

a director, officer or employee; or (iv) a
Beneficiary or any Trustee under this
instrument acting individually;

(12) To release, in the absolute and
uncontrolled discretion of the Trustee, any
fiduciary power at any time, in whole or in
part, temporarily or permanently, whenever
the Trustee may deem it advisable, by an
instrument in writing executed and
acknowledged by the Trustee;

(13) No powers enumerated herein or
accorded to trustees generally pursuant to
law shall be construed to enable a Grantor,
the Trustee, or any other person, to
purchase, exchange, or otherwise deal with
or dispose of the principal or income of
the trust estate for less than an adequate
or full consideration in money or money's
worth, or to borrow the principal or income
of the trust estate, directly or
indirectly, without adequate interest or
security.

B. Distributions to Minor or Incompetent
Beneficiaries. The Trustee in his sole reasonable
discretion may make any distribution required or
permitted to be made to a beneficiary under this
trust agreement, in any of the following ways when a
beneficiary is a minor or a person who is
incapacitated in the absolute and uncontrolled
judgment of the Trustee by reason of legal
incapacity or physical or mental illness or
infirmity: (i) to the beneficiary directly; (ii) to
the guardian of the beneficiary's person or estate;
(iii) by utilizing the same, directly and without
the interposition of any guardian, for the health,
support, maintenance, or education of the
beneficiary; (iv) to a person or financial
institution serving as Custodian for the minor
beneficiary under the Uniform Gifts to Minors Act of
Indiana; or (v) by reimbursing the person who is
actually taking care of the beneficiary (even though
such person is not the legal guardian) for
expenditures made by such person for the benefit of
the beneficiary; and the written receipts of the
persons receiving such distributions shall be full
and complete acquittances to the Trustee;

C. Trust Records. The assets, books of
account and records of any trust created hereunder
shall be available for inspection at any time during

(8) In respect of any stock or other securities forming part of the trusts created hereby, to vote upon any proposition or election at any meeting, and to grant proxies, discretionary or otherwise, to vote at any such meeting; to join in or become a party to any reorganization, readjustment, merger, voting trust, consolidated, or exchange, and to deposit any such securities with any committee, depository, trustee, or otherwise, and to pay out any fees, expenses, and assessments incurred in connection therewith, and to charge the same to principal or income as deemed proper; to exercise conversion, subscription, or other rights, or to sell or abandon such rights, and to receive and hold any new securities issued as a result of any such reorganization, readjustment, merger, voting trust, consolidation, exchange, or exercise of conversion, subscription, or other rights; and, generally, to take all action in respect to any such securitites as could be done by absolute owner;

(9) Whenever required or permitted, to divide or distribute any property, and to make such division or distribution in kind or in money, or in part kind and in part money, and without regard to the income tax basis of any such property;

(10) To engage attorneys, accountants, agents, custodians, clerks, investment counsel, and such other persons as deemed advisable, to make such payments therefor as deemed reasonable, and to charge the expense thereof to income or principal as equitably determined, and to delegate to such persons any discretion deemed proper;

(11) To enter into any transaction on behalf of the trust despite the fact that another party to any such transaction may be (i) a trust of which any Trustee under this instrument is also a trustee; (ii) an estate of which any Trustee under this instrument is also an executor or administrator; (iii) a business or trust controlled by any Trustee under this instrument or of which any such Trustee is

(3) To invest and reinvest (or leave temporarily uninvested) any funds in any property, real or personal, of any kind or nature, including, without limitation, oil, gas and other mineral leases, royalties, overriding royalties, and other interests in minerals, stocks (whether common, preferred, or otherwise), bonds (secured or unsecured), obligations, mortgages, other securities, and interests in any of the foregoing, whether or not productive of income and without regard to the proportion that such property or property of a similar character held may bear to the entire trust estate;

(4) To make any loans, either secured or unsecured, in such amounts, upon such terms, at such rates of interest, and to such persons, firms, or corporations, as deemed advisable;

(5) To borrow money from any source and for any purpose in connection with the advantageous administration of the trusts created hereby; to execute promissory notes or other obligations for amounts so borrowed; and to secure the payment of any amounts so borrowed by mortgage or pledge of any real or personal property;

(6) To mortgage any real property in such amount and on such terms as deemed advisable; to lease any such property for such term or terms, upon such conditions and rentals, and in such manner, as deemed advisable, irrespective of whether the term of any lease shall exceed the period permitted by law or the probable period of any trust created hereby, and to renew or modify an such leases; and to make repairs, replacements, structural or otherwise, of any such property, and to charge the expense thereof in an equitable manner to principal or income, as deemed proper;

(7) To renew or extend the time of payment of any obligation, secured, payable to or by the trusts created hereby, for as long a period or periods of time and on such terms as deemed advisable; and to adjust, settle, compromise and arbitrate claims or demands upon such terms as deemed advisable;

11. Freedom from Bond and Court Supervision. The Trustee shall not be required to give bond or other security in any jurisdiction. The administration of any trust created under this Agreement shall be free from court supervision.

12. Spendthrift Provision. No interest of any beneficiary of a trust created under this Agreement shall be transferable or assignable , or be subject to the claims of any beneficiary's creditors.

13. Provision Pertaining to Rule Against Perpetuities. Notwithstanding any other provision of this Agreement to the contrary, unless sooner terminated in accordance with such provision, each trust created or provided for under this Agreement shall. terminate within 21 years after the death of the last survivor of the following persons: (i) the Grantors; and (ii) the descendants of the Grantors living on the date of this Agreement. If on the day preceding the expiration of any such period any property is still held in trust hereunder, such property shall immediately vest in and be distributed to and among the persons entitled to receive the properties thereof in the same manner and in the same proportion as such properties would be distributed from such trust upon its termination in accordance with the other provisions of this Agreement.

14. Powers and Duties of Trustee.

A. General Powers. The Trustee of the trusts created hereunder shall have all powers granted to Trustees under the Indiana Trust Code, as presently existing and as hereafter amended, and under any other laws applicable to the trusts created under this Agreement. In addition, the Trustee shall have full and complete authority:

(1) To hold and retain in the sole reasonable discretion of the Trustee all or any property received or transferred to the trust by the Grantors, or any other person, without regard to any law or rule of court concerning diversification, risk, or non-productivity;

(2) To sell, exchange, partition, or otherwise dispose of any property, real or personal, at public or private sale, for such purposes and upon such terms, including options and sales on credit, with or without security, as deemed advisable, and no purchaser shall be required to look to the application made by the Trustee of any funds paid to the Trustee;

(b)  During the existence of each trust, the Trustee shall distribute to or for the benefit of such descendant all or so much of the income and principal as the Trustee may determine necessary for the reasonable health, education or support of such descendant.

9.  Discretionary Termination.  This trust may be terminated by the Trustee whenever in the opinion of such Trustee the trust properties are insufficient to justify its continuance.  On termination of the trust under this paragraph, the Trustee shall distribute the remaining trust properties to the income beneficiary (as determined under paragraphs 7 and 8 above).

10.  Resignation and Appointment of Trustee.

(a)  Resignation.  The Trustee may resign upon giving at least 30 days' written notice to the Grantors, while they or either of them is living, and thereafter to the Beneficiary.  If the Beneficiary is then a minor or an incompetent, such notice shall be given to the Beneficiary's guardian.

(b)  Appointment of Successor Trustee.  If David R. Papke fails, refuses or otherwise ceases to serve as Trustee of any trust created under this Agreement, it is hereby agreed that Mary Elise Papke shall serve as Trustee of such trust.  In the event Mary Elise Papke fails, refuses or otherwise ceases to serve as Trustee, it is hereby agreed that Susan Seebruch of West Allis, Wisconsin shall serve as Trustee of such Trust.

(c)  Removal of Trustee.  Any adult competent beneficiary of this trust has the right to remove the Trustee by giving written notice of such intention to the Trustee being removed, by designating in such written notice a bank or trust company having trust powers as successor Trustee, which successor Trustee identified above.  Likewise, the guardian of the person of any minor or incompetent beneficiary of the trust or, if no guardian is so serving, the person having first right to be appointed as guardian of the person of such beneficiary according to the laws of the domicile of such beneficiary (and without any requirement that such individual actually qualify as guardian of the person of such beneficiary) shall have the right to remove the Trustee of this trust by giving written notice of such intention to do so to the Trustee being removed.  The person giving notice of such removal shall designate in such notice a bank or trust company have trust powers, as successor Trustee of such trust, which successor Trustee can be other than the successor Trustee identified above.

(d)  Compensation of Trustee.  Trustee may receive reasonable compensation for services under this Agreement.  Further, Trustee shall be reimbursed for reasonable costs and expenses incurred in connection with such Trustee's duties.

(f)   The Trustee shall at all times while any withdrawal rights are outstanding retain sufficient liquid funds or transferable assets in the trust to satisfy all such withdrawal rights.

7.   Distribution on Termination; Power of Appointment. Upon the Beneficiary attaining the age of twenty-one, one-half of the then corpus and any accumulated income shall be distributed to the Beneficiary free of trust.   The remaining trust properties shall be held in trust until the Beneficiary attains the age of twenty-five, at which time the trust shall terminate, and the principal and accumulated income of the trust shall be distributed to the Beneficiary free of trust.   If the Beneficiary dies before attaining the age of twenty-five, the principal and accumulated income of the trust shall be distributed to such person or persons (not including the Beneficiary, his estate, his creditors or the creditors of his estate) in such amounts or shares as the Beneficiary shall appoint, outright, in trust or otherwise, by will executed after the date of this instrument specifically referring to this power of appointment.

All remaining unappointed income and principal of this trust shall be distributed per stirpes to the then living descendants of the Beneficiary, or if no such descendant is then living, to the Beneficiary's parents' then living descendants, per stirpes; but if no descendant of the Beneficiary or of the Beneficiary's parents is living at the death of the Beneficiary, all remaining unappointed income and principal shall be distributed to the Beneficiary's executors or administrators for administration and distribution as a part of the Beneficiary's estate.   However, if at the time of a distribution under this paragraph there is in existence an inter vivos trust created by the Grantors upon substantially the same terms as set forth herein for the benefit of a sibling or a descendant of a deceased sibling of the Beneficiary, then the properties of this trust otherwise distributable to such sibling or his descendant shall be distributed to that trust to be held and administered under its terms.

8.   Terms for Other Descendants.   If a descendant of the Beneficiary's parents other than the Beneficiary is entitled to recieve properties of this trust when such descendant is less than 21 years of age, then the Trustee shall retain the properties for the benefit of such descendant under the following terms:

(a)   Each trust shall continue until such descendant attains age of 21 years or earlier dies at which time the trust shall terminate and the remaining trust properties shall be distributed to such descendant, if then living, or if then deceased, to his estate.

principal of the trust created hereunder may be applied to payment of premiums on policies of life insurance on the life of either of the parents of the Beneficiary or of either Grantor.

6. Right of Beneficiary to Withdraw Principal.

(a) Following any contributions to the trust estate by the Grantors, or either of them, or any other person, (including the original transfer in trust), the Beneficiary shall have the absolute right to withdraw from the trust estate an amount in cash or property (including but not limited to the actual contribution) equal to the lesser of:

(1) the entire contribution to the trust; or

(2) a portion of the contribution having a fair market value equal to the amount specified for the gift tax exclusion in Internal Revenue Code §2503(b), as from time to time amended, determined as of the date of contribution. If a donor to the trust estate is married at the time of the gift and the gift is of the donor's separate property as defined under local law and eligible for gift splitting under §2513 of the Internal Revenue Code as from time to time amended, this portion shall be doubled, whether or not the donor's spouse joins in the gift pursuant to §2513, as amended. However, aggregate withdrawals with respect to contributions made by one donor during any single calendar year shall not exceed in fair market value the foregoing Internal Revenue Code limitation determined as of the date of contribution of the amount otherwise withdrawable.

(b) The Trustee shall notify the Beneficiary, or the Beneficiary's guardian if the Beneficiary is under legal disability, within a reasonable time following such contribution, that the trust has received an addition as to which the Beneficiary has a demand right.

(c) The demand right of the Beneficiary shall be noncumulative and shall lapse 30 days after receipt by the Beneficiary of the notice herein required.

(d) The demand right shall be exercisable only by written instrument executed by the Beneficiary, or the guardian of the Beneficiary if the Beneficiary is for any reason under a legal disability to exercise the demand right, and delivered to the Trustee.

(e) Upon receipt of such instrument, the Trustee shall immediately distribute to such Beneficiary the properties allocable to him, free of trust.

## INTER VIVOS IRREVOCABLE TRUST AGREEMENT

This Trust Agreement is between Raymond J. Papke and Virginia M. Papke, residents of Milwaukee County, Wisconsin (the "Grantors"), and David R. Papke, as the Trustee (the "Trustee") for the benefit of Tulita Marie Papke (the "Beneficiary").

*cannot contravene public policy or the law*

1. Name and Purpose of Trust. This trust shall be known as the "Tulita Marie Papke TRUST". The purpose of the trust is to provide for the health, education and support of the named beneficiary.

2. Transfer in Trust. The Grantors have transferred and delivered to the Trustee the property listed and described in Schedule "A" attached hereto and made a part hereof. The Trustee, by execution of this instrument, acknowledges receipt thereof. These properties, together with any other property which may hereafter be conveyed to the Trustee subject to this trust, shall constitute the trust estate and shall be held, administered and distributed by the Trustee as provided herein.

3. Additions to Trust Estate. The Grantors, or either of them, or any other person, shall have the right at any time to add to this trust, by inter vivos transfer or by will, properties in addition to those described in Schedule "A" and such properties shall be governed by the provisions of this Agreement as if originally included hereunder.

4. Irrevocability of Trust. This Agreement is irrevocable. The Grantors acknowledge that they, or either of them, have no right or power to alter, amend, revoke, or terminate this trust or any of the terms of this Agreement.

5. Distribution to Beneficiary. The Trustee may, in the Trustee's sole reasonable discretion: (i) distribute to or for the benefit of the Beneficiary or accumulate for her benefit, all or any part of the income of the trust created hereunder; and (ii) distribute to or for the benefit of the Beneficiary all or any amount of the principal of the trust created hereunder as the Trustee deems appropriate for the health, education and support of the Beneficiary without regard to other resources available to the Beneficiary. Any income so accumulated shall be held and distributed on termination in accordance with Paragraph 7 hereof. However, trust income attributable to periods after the date on which the Beneficiary attains the age of 21 shall be distributed to the Beneficiary not less often than semi-annually.

No income or principal of the trust created hereunder shall be paid to or for the benefit of the Beneficiary in satisfaction of a legal obligation of the parents of the Beneficiary, or either of them, or a legal obligation of support of the parents of the Beneficiary, or either of them, unless that support obligation cannot otherwise be met. Likewise, no income or

|     |                                                        |                            |
| --- | ------------------------------------------------------ | -------------------------- |
| H.  | 12 years old --<br>*approximately 1 claimant           | $10,752.75 per claimant    |
| I.  | 13 years old --<br>*approximately 1 claimant           | $7,965.00 per claimant     |
| J.  | 14 years old --<br>*approximately 4 claimants          | $5,973.75 per claimant     |
| K.  | 15 years old --<br>*approximately 0 claimants          | $4,380.75 per claimant     |
| L.  | 16 years old --<br>*approximately 4 claimants          | $3,186.00 per claimant     |
| M.  | 17 years old --<br>*approximately 1 claimant           | $2,389.50 per claimant     |

## Deductions

We reviewed each Claimant's case to determine whether there were any confounding factors that would make it more difficult to establish that Zyprexa was the cause of the Claimant's injuries and/or death. The Claimant's minimum base settlement offer value as supplemented (if appropriate), as set forth above, was then reduced by the specified percentage (set forth below) if one or more of the following factors were present. The total of all such deductions was capped at 90% of the Claimant's base settlement offer value, except in cases involving pre-existing Type-II Diabetes Mellitus with no change in medication (which had the total deductions capped at 95%).

| | |
| --- | --- |
| Preexisting Diagnosis of Type-II Diabetes Mellitus<br>(no change in medication)<br>*approximately 29 claimants | 95% reduction |
| Preexisting Diagnosis of Type-II Diabetes Mellitus<br>(change in medication)<br>*approximately 65 claimants | 75% reduction |
| Aggravation of Diagnosis<br>*approximately 100 claimants | 50% reduction |
| First Use of Zyprexa After September 16, 2003<br>*approximately 206 claimants | 50% reduction |
| Use of Seroquel before Diagnosis of Type-II Diabetes Mellitus<br>*approximately 322 claimants | 30% reduction |
| Family History of Type-II Diabetes Mellitus<br>*approximately 444 claimants | 10% reduction |

*Please note that the number of Claimants in each category above represents only the *approximate* number of individuals with claims eligible for settlement under the Settlement Agreement, and may

## Death Related to Type II Diabetes Mellitus

| | | |
|---|---|---|
| A. | 25 years old or younger --<br>*approximately 0 claimants | $14,337.00 per claimant |
| B. | 26 to 30 years old --<br>*approximately 0 claimants | $13,540.50 per claimant |
| C. | 31 to 35 years old --<br>*approximately 0 claimants | $12,744.00 per claimant |
| D. | 36 to 40 years old or younger --<br>*approximately 1 claimant | $11,947.50 per claimant |
| E. | 41 to 45 years old --<br>*approximately 1 claimant | $11,151.00 per claimant |
| F. | 46 to 50 years old --<br>*approximately 2 claimants | $10,354.50 per claimant |
| G. | 51 to 55 years old or younger --<br>*approximately 1 claimant | $9,558.00 per claimant |
| H. | 56 to 60 years old --<br>*approximately 1 claimant | $8,761.50 per claimant |
| I. | 61 to 65 years old --<br>*approximately 0 claimants | $7,965.00 per claimant |
| J. | 66 years old or older --<br>*approximately 0 claimants | $7,168.50 per claimant |

## Less than Eighteen (18) Years Old at Diagnosis

| | | |
|---|---|---|
| A. | 5 years old --<br>*approximately 0 claimants | $87,615.00 per claimant |
| B. | 6 years old --<br>*approximately 0 claimants | $64,914.75 per claimant |
| C. | 7 years old --<br>*approximately 0 claimants | $47,790.00 per claimant |
| D. | 8 years old --<br>*approximately 0 claimants | $35,842.50 per claimant |
| E. | 9 years old --<br>*approximately 1 claimant | $26,284.50 per claimant |
| F. | 10 years old --<br>*approximately 1 claimant | $19,514.25 per claimant |
| G. | 11 years old --<br>*approximately 0 claimants | $14,227.00 per claimant |

Name: Ernest Moorer; Case Number: 247882